**Clay L. SHAW**

v.

**Jim GARRISON, individually and as District Attorney for the Parish of Orleans, State of Louisiana.**

**Civ. A. No. 71-135.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

May 27, 1971.

Edward F. Wegmann, William J. Wegmann, F. Irvin Dymond, Salvadore Panzeca, New Orleans, La., for plaintiff.

John P. Volz, Andrew J. Sciambra, William R. Alford, Jr., New Orleans, La., for defendant.

CHRISTENBERRY, District Judge.

Clay L. Shaw, plaintiff, has filed a complaint seeking to enjoin and restrain defendant, Jim Garrison, District Attorney for the Parish of Orleans, State of Louisiana, and members of his staff, from further prosecution of a pending

state criminal case entitled "State of Louisiana vs. Clay L. Shaw," No. 208–260, Section "A" of the Criminal District Court of the Parish of Orleans, State of Louisiana. Shaw also seeks to restrain the defendant and his assistants from filing and prosecuting any additional criminal charges arising out of or incidental to the allegations of his complaint. In his complaint plaintiff charges that Garrison conspired with Willard E. Robertson, Joseph M. Rault, Jr. and Cecil M. Shilstone, members of an organization known as Truth or Consequences to deprive him of his constitutional rights.

Plaintiff invokes the jurisdiction of this court pursuant to Title 28 U.S.C. § 1343(3) (4) and Title 42 U.S.C. § 1983 and § 1985 as well as under the Constitution of the United States. He alleges that he has suffered and will suffer irreparable injury due to the defendant's continuing misuse and abuse of the prosecutorial powers vested in defendant by virtue of his office as District Attorney for the Parish of Orleans. Plaintiff contends that Garrison has continued to use in bad faith the state's legal machinery in the prosecution of innocent citizens, such as plaintiff, with no hope of success in obtaining a conviction.

On January 18, 1971, the trial date of the state case, the plaintiff applied to this court for a temporary restraining order. This court denied the application because of the imminence of the trial and the *ex parte* nature of the temporary restraining order. The attorneys for the plaintiff then applied to the United States Court of Appeals for the Fifth Circuit for emergency relief. After a conference with this court a panel of judges of the Fifth Circuit Court of Appeals entered an order directing this court to hold a hearing on the plaintiff's application for injunctive relief. The state case, meanwhile, was continued to January 20th. Upon remand, and after a conference with counsel for both parties present, this court entered a temporary restraining order enjoining the defendant from taking any further action in the prosecution of the state case, pending a hearing on the preliminary injunction which was set for January 25th.

At the hearing, which took three days, numerous witnesses were heard and fifty-five exhibits were offered and filed into evidence by the plaintiff. Both sides were given time to file and have filed briefs.

The facts that give rise to this proceeding result from the defendant Garrison's investigation of the assassination of President John F. Kennedy. To characterize these facts as unique and bizarre is no exaggeration. The plaintiff Shaw has been tried and acquitted on the heinous charge that he conspired to assassinate President Kennedy. Subsequent to his acquittal, the defendant Garrison immediately, and without any witnesses other than those he used at the trial, charged Shaw with perjury. It is this pending state proceeding that the plaintiff seeks to enjoin. Garrison contends that during the course of the conspiracy trial, Shaw, who took the stand in his own defense, perjured himself when he denied having known either David Ferrie or Lee Harvey Oswald, with whom he was alleged to have conspired to assassinate the President.

At the outset, it is to be noted that this court has had the benefit of the most recent expressions of the United States Supreme Court dealing with federal intervention in pending state criminal prosecutions: Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971). These cases reaffirm "the national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances." Younger v. Harris, 401 U.S. at 41, 91 S.Ct. at 749. This court must determine whether the facts of this case fall within the ambit of the "special circumstances" exception expressed in

*Younger.* Discussing the nature of these circumstances the Court in *Younger* stated:

"In all of these cases the Court stressed the importance of showing irreparable injury, the traditional prerequisite to obtaining an injunction. In addition, however, the Court also made clear that in view of the fundamental policy against federal interference with state criminal prosecutions, even irreparable injury is insufficient unless it is 'both great and immediate.' *Fenner, supra* [Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927 (1926)]. Certain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term. Instead, *the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution.* See, *e. g.,* Ex parte Young, *supra,* 209 U.S. [123] at 145–147, 28 S.Ct. [441] at 447–449 [52 L.Ed. 714]." 401 U.S. at 46, 91 S.Ct. at 751 (Emphasis supplied).

Further, in denying injunctive relief to Harris the Court stated:

"It is against the background of these principles that we must judge the propriety of an injunction under the circumstances of the present case. Here a proceeding was already pending in the state court, affording Harris an opportunity to raise his constitutional claims. *There is no suggestion that this single prosecution against Harris is brought in bad faith or is only one of a series of repeated prosecutions to which he will be subjected.* In other words, the injury that Harris faces is solely 'that incidental to every criminal proceeding brought lawfully and in good faith,' *Douglas* [Douglas v. City of Jeannette, 319 U.S. 157, 63

S.Ct. 877, 87 L.Ed. 1324 (1943)], and therefore under the settled doctrine we have already described he is not entitled to equitable relief 'even if such statutes are unconstitutional,' *Buck* [Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941)]." 91 S.Ct. at 753, 401 U.S. at 49 (Emphasis supplied).

Shaw in his complaint alleges that the pending state prosecution has been instituted by Garrison in bad faith and for the purpose of harassment. He contends that this state proceeding is the second of a series of multiple prosecutions to which he has been and will be subjected. These allegations clearly state a basis for injunctive relief, if proven. See Buie v. Pigott, 439 F.2d 153 (5th CCA 1971). They meet the "special circumstances" requirements of *Younger.* The question is whether the facts as adduced at the hearing support the allegations. To resolve this question a review of those facts is necessary

On November 22, 1963, President John F. Kennedy was assassinated in Dallas, Texas. Immediately thereafter, Lee Harvey Oswald was accused of committing the crime. Unfortunately, less than forty-eight hours after the President's death, Oswald was slain. The defendant Garrison testified that his office first participated in an investigation of the President's assassination when it learned that Oswald had spent the prior summer in New Orleans. A short investigation by his office resulted in the arrest of David Ferrie who was turned over to the Federal Bureau of Investigation for questioning.[1] It was not until several years later, in November of 1966, that the defendant decided that further investigation by him was necessary. This decision came after an extensive investigation by a commission, the Warren Commission, created on November 29, 1963 pursuant to Executive Order No. 11130 by President Lyndon B. Johnson "to as-

---

1. In his book, *A Heritage of Stone,* Shaw Exhibit No. 21, Garrison states his office had been informed that Oswald and Ferrie were "associated together in the Civil Air Patrol" in New Orleans.

certain, evaluate and report upon the facts relating to the assassination of the late President John F. Kennedy and the subsequent violent death of the man charged with the assassination." The testimony of approximately 550 witnesses before the Commission and more than 3100 exhibits received into evidence make up the contents of 26 bound volumes. However, despite this exhaustive probe, Garrison, according to his testimony, concluded that "the Federal Government had not been looking into it honestly, and that it had been a fake investigation * * * " so in November, 1966, he decided that his office would undertake what he termed "a serious investigation."

At this point, a serious question concerning the basis for Garrison's decision arises. Apparently, his jurisdiction was based on Oswald's activities in New Orleans in the summer of 1963.[2] However, it is strange indeed that, nearly three years after the assassination, Garrison would decide to undertake an investigation of such gravity merely because he disagreed with the findings of the Warren Commission and Oswald had spent some time in New Orleans. The defendant did not testify as to what evidentiary basis led him to believe that further investigation of the assassination of the President was needed.

The testimony of William A. Gurvich corroborated the defendant's statement that the assassination investigation began in the latter part of 1966. Gurvich, an experienced investigator whom this court believed, testified that Garrison solicited his help to conduct the investigation on or about December 23, 1966. Gurvich subsequently accepted and participated in the probe until June 27, 1967 when he resigned. He stated that he resigned because he believed the investigation was a "fraudulent, criminal act."

According to Garrison, Shaw was first interviewed in his office in December, 1966. Garrison testified that at that time Shaw was not considered a suspect by the defendant and was not advised of his constitutional rights, nor was he told of his right to counsel. Just how the plaintiff was first selected to be interviewed by the defendant when he was not a suspect is another unanswered question in this case. The defendant offered no evidence to show any basis or cause for his office's interrogation of the plaintiff concerning such a shocking crime. His failure to offer any explanation leaves this court with but one conclusion, namely, that there was no factual basis for questioning Shaw concerning the assassination. This conclusion is supported by further facts that are discussed hereafter.

On March 1, 1967, plaintiff was arrested by the defendant and charged with "participating in a conspiracy to murder John F. Kennedy." Two events prior to his arrest are of significance. One is the emergence of a witness named Perry Raymond Russo. The other is the formation of a group which called itself "Truth or Consequences."

### Perry Raymond Russo

On February 20, 1967, David Ferrie, the defendant Garrison's link between Oswald and a supposed New Orleans based conspiracy to assassinate the President, died. Shortly thereafter Andrew J. Sciambra, an assistant district attorney in the defendant's office, went to Baton Rouge to interview Perry Raymond Russo, as a result of a newspaper article in which Russo made several statements concerning Ferrie. Sciambra testified this was on or about February 25, 1967, four days prior to the date of the plaintiff's arrest. Garrison testified this was the first time his office became aware of Russo. Sciambra wrote two memoranda of the Baton Rouge meeting with Russo, one of which was introduced into evidence. In the memorandum filed into evidence, no mention is made of any conspiratorial meeting to assassinate the President. The

2. The defendant states this basis in his book.

following Monday, February 27th, two days before Shaw's arrest, Russo came to New Orleans. At the instruction of the defendant, he was subjected to Sodium Pentothal by the late Dr. Nicholas Chetta, who was the Coroner for the Parish of Orleans, and hypnosis by Dr. Esmond Fatter. The defendant stated the purpose of these strange procedures was "to obtain a degree of corroboration" of what Russo had related to Sciambra in Baton Rouge of a New Orleans conspiratorial meeting between the plaintiff, Ferrie and Oswald. It should be borne in mind that the memorandum which Sciambra wrote on his return from Baton Rouge did not mention any such meeting. However, substantial doubts are raised regarding the validity and objectivity of the state's case when a prosecuting attorney resorts to the use of such extraordinary tactics as were employed by Garrison on Russo. A fair inference to be drawn is that these *ex parte* procedures were used to implant into Russo's mind a story implicating the plaintiff in an alleged conspiracy plot. This could have been accomplished by post-hypnotic suggestion. This inference is supported by the fact that Garrison immediately moved to arrest and charge Shaw based solely on Russo's questionable, vague story. Such hasty action on the part of the defendant without further investigation and without submitting the matter, at that time, to the grand jury demonstrates ulterior motives.

Judge James L. Alcock, who was on the defendant's staff, and was the chief prosecuting attorney at the Shaw conspiracy trial, testified that the only witness against Shaw at the time of his arrest was Russo. Garrison did not rebut this testimony, even when this court confronted him with it. He refused to answer the question when it was propounded to him by plaintiff's counsel and this court.

■■ This is a very pertinent point in this case. The burden of proof is, of course, upon the plaintiff Shaw to prove by a preponderance of the evidence the existence of exceptional and unusual circumstances that would justify this court's intervention. Younger v. Harris, *supra*. When the plaintiff's evidence constitutes a prima facie case, the burden is on the defendant of going forward with any evidence to rebut the plaintiff's case. *Cf.* Bush v. Kaim, 297 F. Supp. 151, 161 (N.D.Ohio 1969); Mann v. Davis, 213 F.Supp. 577, 584 (E.D.Va. 1962), aff'd, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964). In this case the defendant Garrison offered no proof, apparently relying on the supposed inability of Shaw to sustain his burden and that even if Shaw did, he would not be entitled to any relief by this court. In those instances where the plaintiff proved certain facts by a preponderance of the credible evidence, and the defendant failed to rebut those facts either on cross-examination or by offering contrary evidence, this court has accepted those facts as true.

The lack of substance of Russo's story is emphasized by several events which occurred subsequent to Shaw's arrest. At Shaw's conspiracy trial, Russo's testimony differed materially from that which he gave at a preliminary hearing prior to the trial. The most salient change in his testimony was his inability at the trial to identify the plaintiff as having been present at an alleged conspiratorial meeting in New Orleans. At the preliminary hearing he stated unequivocally that the plaintiff Shaw was present. This change was no surprise to Garrison as he had been told previously by Lieutenant Edward A. O'Donnell of the New Orleans Police Department that Russo could not identify Shaw as having been a participant in an alleged conspiratorial meeting.

Lt. O'Donnell has been a member of the New Orleans Police Department for 19 years. He impressed this court with the candor with which he testified. In 1967, he was the department's polygrapher and in June, 1967, at Garrison's request, he attempted to give Russo a lie detector test. It was not successful. However, O'Donnell stated he took the

**396**

machine's attachment from Russo's body and continued on with the interview. According to O'Donnell, Russo told him that he did not know if Shaw was at David Ferrie's apartment the night of the alleged meeting to plot the assassination. Russo stated that if he were pressed for an answer, he would have to say that Shaw was not present. He further stated to O'Donnell that "he was under a great deal of pressure and that he was sorry he ever got involved in this mess." O'Donnell testified that he gave Garrison both an oral and written account of his interview with Russo. The written report was filed into evidence in this case by the plaintiff. O'Donnell said Garrison became enraged when he made his report and insinuated that O'Donnell had "sold out to the press or * * * to someone." Garrison stated in his testimony that he questioned the veracity of O'Donnell's report. Yet this witness was subject to cross-examination at the hearing and nothing was adduced to shake his testimony or impeach his credibility. Moreover, it is significant that O'Donnell presently conducts polygraph tests for the defendant's office, which tests are used and acted on by members of the defendant's staff.

The defendant Garrison did not make available to the plaintiff's counsel the report of Lt. O'Donnell. Instead, he withheld it despite the fact that its subject matter pertained directly to statements that were pertinent to the credibility of Russo, the only witness upon whose story Shaw had been arrested.

The defendant testified that in 1967 he believed Russo's story that the plaintiff was present at the alleged conspiratorial meeting and that he still believes this story. Apparently, Russo himself does not share this belief. After having testified previously both at a preliminary hearing and at the conspiracy trial in state court, Russo, at the hearing in this court, invoked the protection afforded by the Fifth Amendment to the United States Constitution, and refused to testify when asked the precise question he had previously answered in the state proceedings. Normally no inference can be drawn when one invokes a right secured to him by the Constitution. However, in the circumstances of this case this court believes that it can and it does draw the narrow inference from Russo's action, that even today, he at least has substantial doubts as to the truthfulness of the testimony he gave in state court.

It would appear that the unusual nature of Russo's story combined with the fact that Russo had come to Garrison's attention as the result of Russo's public statements to the press, should have created some skepticism on the part of the defendant, if he had been acting in good faith. Instead, he chose to ignore the absence from Sciambra's memorandum of mention of the alleged meeting. He resorted to the use of drugs and hypnosis on Russo, purportedly to "corroborate," but more likely to concoct his story. Garrison moved with unexplained haste to arrest and charge Shaw based solely on that story. When Lt. O'Donnell reported to him, Garrison ignored and suppressed the contents of that report which were unfavorable to his case against Shaw. All these actions considered with the subsequent doubtfulness on the part of Russo as a witness show clearly that the defendant Garrison did not act in good faith regarding Russo's story. Garrison was aware of Russo's unreliability from Sciambra's first interview. Yet he arrested, charged, and prosecuted Shaw once and now has again charged him for an offense stemming from Russo's story. Garrison's use of Russo is but one of several factors that reveal his *mala fides* in this case. "Truth or Consequences" is another.

### Truth or Consequences

At the hearing, it was determined that the defendant's office spent more than $99,000 while conducting its probe of the assassination and Shaw. Approximately $25,000 of this amount came from the Fines and Fees Account of defendant's office. This account represents monies that are received from bond forfeitures and fines and are used by Garrison to

defray expenses of his office. In order to expend these funds, a motion and order must be submitted to a state judge for his signature. After the judge signs it, a check is drawn to pay the expense incurred. A copy of all motions for disbursements from the account is kept by the defendant's office and the account is subject to a yearly audit. Nearly $70,000 of the $99,000 amount came from an account denominated the J. G. Safi Account. This was a separate account, not subject to audit, set up by the defendant to be used for the expenses of the investigation. The defendant testified that "virtually all of this money you are talking about" concerns investigations subsequent to the one conducted in Mr. Shaw's case. This statement is not correct when viewed in the factual context of this case. As stated above, Shaw was arrested on the basis of the statement of one witness. The investigation followed the arrest and was for the purpose of making the charge against Shaw stick. At his conspiracy trial, over forty witnesses were called by the state. Judge Alcock, the state's chief prosecuting attorney at the conspiracy trial, testified in this court that, to his knowledge, most of the state's witnesses were secured after Shaw's arrest. The record in this case reveals that most of the defendant's investigative expenses were incurred in the period between Shaw's arrest and his trial. The evidence is overwhelming that these funds were used in preparation for Shaw's conspiracy trial.

 The defendant throughout these proceedings has attempted to distinguish between the Shaw case and the investigation of President Kennedy's assassination. He sought to differentiate between the two by testifying that his assassination probe and the expenses incurred therein had "nothing really to do with Mr. Shaw or the original case against Mr. Shaw, or the forthcoming case against Mr. Shaw." The incongruity of this statement is apparent and appalling. No other arrest and trial has resulted from the investigation but that of Clay Shaw. Without Clay Shaw, the defendant had no jurisdictional ground on which to justify his New Orleans based investigation of the assassination. Shaw is an integral part of the probe as evidenced by the fact that only he has been affected by the investigation. Without Shaw, there could be no probe. Garrison states he was interested in the "forces responsible for the assassination, rather than individuals." Notwithstanding this statement by Garrison, this court, considering all of the evidence, finds that Garrison undertook his baseless investigation with the specific intent to deprive Shaw of his rights under the First, Fifth and Fourteenth Amendments to the Constitution of the United States. Moreover, in an action based on Title 42 U.S.C. § 1983, specific intent is not a necessary element. See Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Whirl v. Kern, 407 F.2d 781 (5th CCA 1969), cert. den., 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969). A defendant can be held responsible under the Civil Rights Act of 1871 "for the natural consequences of his actions." Monroe v. Pape, *supra,* 365 U.S. at 187, 81 S.Ct. at 484. To separate the investigation of Shaw from the investigation generally would be fallacious and this court does not make that distinction. For purposes of this case, the investigation of Shaw and the assassination probe by the defendant are viewed as being synonymous by this court. This is especially significant in appraising the facts concerning the operations of the so-called "Truth or Consequences" group.

"Truth or Consequences" was created in the latter part of February, 1967, shortly before Shaw's arrest on March 1, 1967. Three men, Willard E. Robertson, Joseph M. Rault, Jr. and Cecil M. Shilstone, formed this group to financially support Garrison's investigation. They not only contributed their own funds but solicited contributions from others and fund-raising breakfasts and other meetings were held to which prospective contributors were invited. Garrison attended and spoke at these meetings. Rault

stated the group's purpose was to provide Garrison with private funds to conduct his assassination probe. According to Shilstone, the idea of using private funds was to allow Garrison to avoid accounting publicly for his expenditures in conducting the investigation. Nearly all of the funds contributed to "Truth or Consequences" came after the arrest of the plaintiff Shaw. No conditions were imposed on Garrison's use of these funds except that they be expended in the assassination probe.

It is significant that these individuals all testified that they did not know or wish to know how Garrison spent these funds. They did not require Garrison to give any accounting of the funds he used and he could draw checks at will on the J. G. Safi Account,[3] the Truth or Consequences account and the Garrison Fund account to which the Truth or Consequences account was later transferred at the request of Robertson.

Robertson stated that he personally borrowed $30,000 on two notes from the Bank of New Orleans to contribute to the fund. This money was lent to him on his personal credit and he is personally liable for it. Additionally, he has been paying interest on this debt. Robertson stated that he and Garrison were close personal friends. He said he gave Garrison the money with the understanding that Garrison would eventually repay him. Robertson stated, as did Rault, that this money was to be used in Garrison's investigation of the assassination, not in the prosecution of Clay Shaw. Yet, it was never explained what prompted these three individuals, one an attorney, in late February to believe that the District Attorney for Orleans Parish should have a reason to investigate the assassination which occurred in Dallas, Texas. All testified that they did not know that Garrison suspected Shaw when they formed their organization. However, it is clear that the bulk of the

monies contributed for investigative use by the defendant came during the period after Shaw's arrest and prior to his trial. Robertson's notes at the bank are dated November 9, 1967 and January 17, 1968. Shilstone testified that of the $1200 he contributed, $1000 was given on August 11, 1967. Rault managed the fund and wrote numerous checks payable to Garrison and members of Garrison's staff at their request. Most of these checks were written after Shaw's arrest but before his trial. Finally, it is important to note that no monies were contributed or used after the Shaw trial. All of these facts are indicative of the motives of Garrison and these three contributors. When Shaw was arrested the money came in; when he was acquitted, it stopped. The inference that these three persons were aiding Garrison in the prosecution of Shaw is further supported by the fact that Robertson employed in his automobile business a state's witness, Roger Craig from Dallas, Texas, during the course of the Shaw conspiracy trial. After the trial Craig went back to Dallas. Robertson professed to believe that it was merely a coincidence that Craig applied to him for employment and testified he could not remember whether the employment began before or after Craig testified.

The evidence is clear that Garrison was in bad faith in using these funds to prosecute Clay Shaw. Rault frankly testified that he expected results for the money contributed by him. Doubtless this is true of the other two, Robertson and Shilstone. The perjury charge against Shaw is part of Garrison's effort to produce such results.

Perhaps of all the evidence presented at the hearing, that concerning Shaw's arrest and his subsequent prosecution on the conspiracy charge is the most demonstrative of the defendant's bad faith in this case.

---

3. J. G. Safi Account was the name given to an account in the Bank of Louisiana in New Orleans to describe the Jim Garrison account—Special Account for Investigation.

As stated above, Shaw was first interviewed in the defendant's office in December, 1966. At 1:00 P.M. on March 1, 1967, Shaw appeared voluntarily at the defendant's office. Shaw testified that this appearance was at the request of Garrison's office after Shaw had called to verify a report that a subpoena had been issued compelling him to appear at that office. After waiting an hour or so, Shaw said he was interrogated by Sciambra and Louis Ivon, a police officer assigned to the defendant's office. Ivon was chief investigator for the District Attorney at that time. Neither Sciambra nor Ivon advised the plaintiff of his constitutional rights before commencing the interrogation. Shaw testified that after a period of interrogation, he was told that he would be required to take a lie detector test. He was also told that if he refused, he would be charged with conspiracy to murder the President of the United States. Refusing to take the test and demanding an attorney, Shaw was given the opportunity to call his lawyers. Ivon testified he did not know that Shaw was going to be arrested when the interrogation was taking place, but rather he learned of this fact only later in the day when Garrison instructed him to make the arrest.

Garrison carefully set the stage for Shaw's arrest, which took place at approximately 5:30 P.M., four and a half hours after Shaw voluntarily appeared in Garrison's office. During this time, a representative of Life Magazine photographed Shaw through a two-way mirror unbeknownst to him. The hallway outside the defendant's office on the second floor of the New Orleans Criminal Courts Building had mysteriously become congested with newsmen, photographers, television camera crews, and members of the general public. Shaw was led handcuffed into the hallway, where he was shoved and pushed through the crowd to reach an elevator leading to the basement of the building and then to Central Lockup. All of this appeared on television. Shaw could have been taken down in a private elevator located in Garrison's office, but this would not have afforded the publicity Garrison was obviously seeking. Shaw's arrest and the manner in which it was effected was outrageous and inexcusable. The only conclusion that can be drawn from Garrison's actions is that he intentionally used the arrest for his own purposes, with complete disregard for the rights of Clay Shaw.

The defendant's total disregard of Shaw's rights is accentuated by his pre-trial conduct in preparing for the conspiracy trial. The evidence shows that Garrison on several occasions held press conferences or issued press releases during the pre-trial period. On one occasion, Garrison admitted that he issued a statement to the press with a letter attached which he had written to a national newspaper, *The National Observer*. Garrison stated the letter was a complaint he made to the newspaper regarding an article about Shaw. At the very instant Garrison was issuing the press release, Alcock, his first assistant, was arguing in state court that Shaw and his attorneys were not entitled to the letter attached to the release. When confronted with this inconsistency, Garrison stated, "I suppose I was more generous than Mr. Alcock." However, the point is that the object of Garrison's bounty was the news media and not the then defendant, Clay Shaw. This is another of the indicative facts regarding Garrison's bad faith. Coupled with the suppression of Lt. O'Donnell's report of his interview with Russo, discussed above, the action of Garrison in releasing information to the press while denying it to Shaw clearly reveals that the defendant was not prosecuting Shaw in good faith.

### The Perjury Charge

■ On Saturday, March 1, 1969 at 1:00 A.M., a unanimous jury returned a verdict of not guilty in the conspiracy trial. After forty days of trial the jury took only 55 minutes to reach its verdict. On the next working day, Monday, March 3, 1969, the defendant Jim Garrison filed an information personally signed by him

charging Clay Shaw with the crime of perjury. The instant proceeding, of course, grows out of this charge. Prosecuting officials have wide discretion and necessarily so, but the court finds that as in the case of defendant's previous actions with regard to Shaw, the perjury charge was brought in bad faith and for purposes of harassment, being the product of both selective law enforcement and financial interest.

Shaw of course was charged with perjury on the basis of testimony given by him in his own defense at the conspiracy trial. No witness who testified before this court, including Garrison, could give another instance in which a defendant who took the stand and was acquitted was subsequently charged by Mr. Garrison with perjury. This fact standing alone does not evidence bad faith. It does however call for some explanation. Though requested by counsel for defendant and by this court, none was given. No explanation was given even though it was admitted by Mr. Alcock that at the time the perjury charge was filed there were no witnesses available other than those who were available at the conspiracy trial. Mr. Garrison himself refused to answer the question of whether there was any new evidence tending to show perjury on the part of Mr. Shaw. Moreover, the evidence shows that although substantial discrepancies existed in the trial testimony and testimony previously given by state witnesses, Russo and Bundy, the latter a narcotic addict and known by Garrison to be such, no perjury charges have been filed against them.

Coupled with these facts is the fact that Garrison has a significant financial interest in the continued prosecution of Clay Shaw. Garrison's book, *Heritage of Stone*, concerns his investigation of President Kennedy's assassination. Defendant also has a contract to write three additional books. It is obvious that the sale of defendant's book may be promoted by the publicity resulting from the continued prosecution of Clay Shaw. It provides a means whereby defendant himself may profit, and also repay the substantial obligations owed to one of his financial backers. The court finds that this desire for financial gain is among the motives which prompt the continued prosecution of Clay Shaw.

Finally, this court must make another comment concerning the facts of this case. In his book, *Heritage of Stone*, defendant Garrison makes several references to the Dreyfus case. When we consider Garrison's actions toward Shaw it is small wonder that in writing his book that classic example of injustice came to his mind.

Considering all of the evidence adduced at the hearing of this matter the court finds that the pending prosecution was brought in bad faith and that such bad faith constitutes irreparable injury which is great and immediate. The court further finds that this is a case of exceptional and extremely limited circumstances.

Having found bad faith that constitutes irreparable injury which is both "great and immediate" this court finds itself faced with Mr. Justice Stewart's "negative pregnant." [4] Where "exceptional and extremely limited circumstances" are found, is intervention by way of injunction subject to any further

---

4. In his concurring opinion in Younger v. Harris, 401 U.S. 37, 56, 91 S.Ct. 746, 756, 27 L.Ed.2d 669, 681 (1971), Mr. Justice Stewart stated:

"The Court confines itself to deciding the policy considerations that in our federal system must prevail when federal courts are asked to interfere with pending state prosecutions. Within this area, we hold that a federal court must not, save in exceptional and extremely limited circumstances, intervene by way of either injunction or declaration in an existing state criminal prosecution.[3]"

Footnote 3 states:

"3. The negative pregnant in this sentence—that a federal court may, as a matter of policy, intervene when such 'exceptional and extremely limited circumstances' are found—is subject to any further limitations that may be placed on such intervention by 28 U.S.C. § 2283."

limitation that may be placed on such intervention by 28 U.S.C. § 2283?

■ The origins of 28 U.S.C. § 2283 have been amply traced by several courts[5] and this court does not intend to retrace their steps. Suffice it to say that § 2283 is not jurisdictional,[6] but rather is a legislative enactment of the judicial doctrine of comity.[7] It is also clear that irrespective of additional limitations imposed, § 2283 is at least as broad as the judicially developed doctrine of comity.[8] This is evident from a read-

ing of *Younger, supra,* and its companion cases[9] where disposition was based not on the effect of § 2283 independently but rather on the failure to show "exceptional and extremely limited circumstances." If § 2283 is determined to be inapplicable[10] or if it is merely synonymous with the juidicially developed doctrine of comity[11] then plaintiff is entitled to injunctive relief as he has amply shown that this case falls squarely within the exception to that doctrine.[12] If § 2283 is applicable[13] and if it is as-

5. Atlantic C.L.R.R. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970); Baines v. City of Danville, 337 F.2d 579 (4th CCA 1964), cert. den., Chase v. McCain, 381 U.S. 939, 85 S.Ct. 1772, 14 L.Ed.2d 702 (1965); Sheridan v. Garrison, 415 F.2d 699 (5th CCA 1969), cert. den., 396 U.S. 1040, 90 S.Ct. 685, 24 L.Ed.2d 685 (1970).

6. Smith v. Apple, 264 U.S. 274, 44 S.Ct. 311, 68 L.Ed. 678 (1924); Machesky v. Bizzell, 414 F.2d 283 (5th CCA 1969).

7. Sheridan v. Garrison, 415 F.2d 699 (5th CCA 1969), cert. den., 396 U.S. 1040, 90 S.Ct. 685, 24 L.Ed.2d 685 (1970); Machesky v. Bizzell, 414 F.2d 283 (5th CCA 1969); Baines v. City of Danville, 337 F.2d 579 (4th CCA 1964), cert. den., Chase v. McCain, 381 U.S. 939, 85 S.Ct. 1772, 14 L.Ed.2d 702 (1965).

8. Baines v. City of Danville, 337 F.2d 579 (4th CCA 1964), cert. den., Chase v. McCain, 381 U.S. 939, 85 S.Ct. 1772, 14 L.Ed.2d 702 (1965).

9. Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971).

10. Leiter Minerals, Inc. v. United States, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267 (1957). In *Leiter,* § 2283 was held not to be applicable where the United States is a party. There the Court reasoned that the application of § 2283 would frustrate "superior federal interests." See also Studebaker Corp. v. Gittlin, 360 F.2d 692 (2d CCA 1966), involving the use of injunctive powers pursuant to

the Securities & Exchange Act. Under the rationale of *Leiter, supra,* it is doubtful that the rights plaintiff asserts here could be characterized as being of "superior federal interest" so as to make § 2283 altogether inapplicable.

11. It is obvious that several courts have taken this view. That is to say that § 2283 is no more stringent than the limitations imposed by the general principles of comity. In these cases § 2283 was deemed not to be an obstacle to the granting of relief once irreparable injury is shown. This was so even though pending criminal prosecutions were enjoined. Duncan v. Perez, 321 F.Supp. 181 (E.D.La.1970); Carmichael v. Allen, 267 F.Supp. 985 (N.D.Ga.1967).

12. Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943). *Douglas,* since it did not involve a pending prosecution, was not concerned with the effect, if any, of § 2283. It remains, however, one of the clearest statements of the requirements which must be met under the judicially fashioned doctrine of comity. *Younger* shows that the requirements of *Douglas* are also to be applied in cases where § 2283 is invoked. See also language quoted from Atlantic C.L.R.R. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970), footnote 14, *infra,* where Mr. Justice Black states that an injunction must be "otherwise proper under general equitable principles" even if based on one of the specific statutory exceptions to § 2283.

13. It must be assumed that a pending criminal action is a "proceeding" within the intendment of § 2283. Dombrowski v. Pfister, 380 U.S. 479, 484, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). In *Dombrowski,* the court clearly pointed out the distinction between criminal prosecutions which are merely threatened and those which are actually pending.

sumed that the holding of Atlantic C. L. R. R. Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970) is still viable,[14] i. e., the anti-injunction statute is absolute, meaning no judicially created exceptions are to be allowed, then the plaintiff's showing of "exceptional and unusual circumstances" is not sufficient in and of itself to warrant the granting of relief absent the additional showing that relief is based on one of the expressly enumerated exceptions to § 2283.[15] It is obvious under the facts of this case, that the only feasible statutory exception is one which makes § 2283 inapplicable where "expressly authorized by Act of Congress." This of course brings the court to a consideration of the problem of whether § 1983 should be considered an express exception to § 2283. As in the case of § 2283, this issue has been the object of much judicial comment.[16] The Supreme Court has on several occasions noted the existence of the issue but declined to decide it.[17]

■ This court feels that it may not fairly and justly avoid this issue and, therefore, for the reasons assigned, determines that § 1983 does constitute an express exception to § 2283.

■ Initially it should be noted that this court is aware of the warning in *Stefanelli*[18] and the important policy

---

14. The language in *Atlantic C. L. R. R.*, *supra*, is explicit. Mr. Justice Black stated as follows:

 "The respondents here have intimated that the Act only establishes a 'principle of comity,' not a binding rule on the power of the federal courts. The argument implies that in certain circumstances a federal court may enjoin state court proceedings even if that action cannot be justified by any of the three exceptions. We cannot accept any such contention. In 1955 when this Court interpreted this statute, it stated: 'This is not a statute conveying a broad general policy for appropriate *ad hoc* application. Legislative policy is here expressed in a clear-cut prohibition qualified only by specifically defined exceptions.' *Amalgamated Clothing Workers of America v. Richman Bros.*, 348 U.S. 511, 515–516 [75 S.Ct. 452, 455, 99 L.Ed.600] (1955). Since that time Congress has not seen fit to amend the statute and we therefore adhere to that position and hold that any injunction against state court proceedings otherwise proper under general equitable principles must be based on one of the specific statutory exceptions to § 2283 if it is to be upheld. Moreover since the statutory prohibition against such injunctions in part rests on the fundamental constitutional independence of the States and their courts, the exceptions should not be enlarged by loose statutory construction." 398 U.S. at 286–287, 90 S.Ct. at 1743.

15. 28 U.S.C. § 2283 provides:

 "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

16. Cooper v. Hutchinson, 184 F.2d 119 (3d CCA 1950) and its progeny, DeVita v. Sills, 422 F.2d 1172 (3d CCA 1970), and National Land & Investment Company v. Specter, 428 F.2d 91 (3d CCA 1970) express the Third Circuit's view that the Civil Rights Act of 1871, 42 U.S.C. § 1983, comes within the expressly authorized exception to the anti-injunction provisions of § 2283. The Fourth, Sixth, and Seventh Circuits take the opposite view. Baines v. City of Danville, 337 F.2d 579 (4th CCA 1964), cert. den., Chase v. McCain, 381 U.S. 939, 85 S.Ct. 1772, 14 L.Ed.2d 702 (1965); Sexton v. Barry, 233 F.2d 220 (6th CCA), cert. den., 352 U.S. 870, 77 S.Ct. 94, 1 L.Ed.2d 76 (1956); Smith v. Village of Lansing, 241 F.2d 856 (7th CCA 1957). The Fifth Circuit has declined to answer the question. Machesky v. Bizzell, 414 F.2d 283, 287 (5th CCA 1969).

17. Cameron v. Johnson, 390 U.S. 611, 613–614, n. 3, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968); Dombrowski v. Pfister, 380 U.S. 479, 484, n. 2, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

18. Stefanelli v. Minard, 342 U.S. 117, 122–124, 72 S.Ct. 118, 96 L.Ed. 138 (1951):

 "If these considerations limit federal courts in restraining State prosecutions merely threatened, how much more cogent are they to prevent federal interference with proceedings once begun. If the federal equity power must refrain from staying State prosecutions

considerations which underlie it. It is the opinion of this court however that such policy considerations are inapplicable under the facts of this case. This court is not dealing with a single good-faith criminal prosecution wherein allegations of unconstitutional procedures are made. This court is dealing with a case of continuing harassment and multiple prosecutions, with the likelihood that such harassment and prosecution will continue in the future, unless abated by direct federal court intervention. Herein lies the unique nature of this case and the resulting impotency of traditional avenues of relief. If plaintiff is forced to stand trial for perjury, takes the stand and is acquitted, this court has no doubt but that plaintiff will be charged anew on the basis of statements made by him from the witness stand. A request for relief in this subsequent prosecution would be met with the same arguments put forth by the defendant in the instant proceeding and so on *ad infinitum*. Surely at some point plaintiff's precious constitutional rights must be vindicated.

Aside from this consideration, however, is the fact that not every § 1983 suit will pass muster as the basis for federal injunctive relief. A reading of *Younger* clearly shows that whatever this court says concerning § 1983 and its relationship to § 2283, an independent showing of "exceptional circumstances" must be made before a plaintiff may successfully invoke federal injunctive re-

lief.[19] Thus while all § 1983 suits may constitute express exceptions to the prohibitions contained in § 2283, only those § 1983 suits which contain exceptional circumstances, *i. e.*, which constitute exceptions to the judicial doctrine of comity, are the proper subjects for equitable relief. It is the firm conviction of this court that the granting of equitable relief here will neither be an "insupportable disruption" of nor a "flanking movement against" the administration of criminal justice by the state.

Whatever else may be said about § 1983 and its antecedents under the Civil Rights Act of 1871, one fact is eminently clear—they were designed to prohibit any state from depriving a citizen of his constitutional rights. To this end Congress gave to the courts the power to grant appropriate relief, including relief which is equitable in nature. It goes without saying that one of the most effective tools that a state or subdivision thereof has with which to deprive a citizen of his rights is its criminal laws and the ability to prosecute thereunder. Unless one is to assume that Congress through the equity grant of § 1983 intended only sham relief (an assumption this court refuses to make) there is every reason to hold that the equitable remedy expressly authorized in 42 U.S.C. § 1983 is within the exception set forth in 28 U.S.C. § 2283. Cooper v. Hutchinson, 184 F.2d 119, 124 (3d CCA 1950). This

outright to try the central question of the validity of the statute on which the prosecution is based, how much more reluctant must it be to intervene piecemeal to try collateral issues.

The consequences of exercising the equitable power here invoked are not the concern of a merely doctrinaire alertness to protect the proper sphere of the States in enforcing their criminal law. If we were to sanction this intervention, we would expose every State criminal prosecution to insupportable disruption. Every question of procedural due process of law—with its far-flung and undefined range—would invite a flanking movement against the system of State courts by resort to the federal

forum, with review if need be to this Court, to determine the issue. Asserted unconstitutionality in the impaneling and selection of the grand and petit juries, in the failure to appoint counsel, in the admission of a confession, in the creation of an unfair trial atmosphere, in the misconduct of the trial court—all would provide ready opportunities, which conscientious counsel might be bound to employ, to subvert the orderly, effective prosecution of local crime in local courts. To suggest these difficulties is to recognize their solution." (Footnotes omitted.)

19. Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). See also notes 12 and 13 *supra*.

court holds that § 1983 is within the exception set forth in § 2283.

Considering the evidence and the law, this court is convinced that the plaintiff is entitled to the relief sought. Accordingly, it is ordered that a permanent injunction issue restraining Jim Garrison, District Attorney for the Parish of Orleans, his assistants, employees, agents and all persons in active concert and participation with him from further prosecution of the pending criminal action entitled "State of Louisiana v. Clay L. Shaw," No. 208–260.

Counsel for plaintiff will prepare and present an appropriate injunction. In the interim the temporary restraining order now in effect will be extended for an additional ten days from May 29, 1971, or until such time before then that the permanent injunction is entered.