Clay L. SHAW, Plaintiff-Appellee,

v.

Jim GARRISON, Individually, and as District Attorney for the Parish of Orleans, State of Louisiana, Defendant-Appellant.

No. 71–2422.

United States Court of Appeals, Fifth Circuit.

July 31, 1972.

Certiorari Denied Nov. 20, 1972. See 93 S.Ct. 467.

John P. Volz, Chief Asst. Dist. Atty., New Orleans, La., Eberhard P. Deutsch, New Orleans, La., for defendant-appellant.

Edward F. Wegmann, William J. Wegmann, Richard B. Sobol, New Orleans, La., for plaintiff-appellee.

Before WISDOM, GODBOLD, and RONEY, Circuit Judges.

WISDOM, Circuit Judge:

In this case the district court found that Jim Garrison, District Attorney for the Parish of Orleans, Louisiana, in bad faith and for purposes of harassment brought a criminal prosecution for perjury against Clay Shaw. 328 F.Supp. 390 (1971). The court found that the prosecution would cause great and irreparable injury to Shaw and enjoined the district attorney and his staff "from further prosecution of the pending criminal action". 328 F.Supp. at 404. We affirm: the findings were not clearly erroneous; they meet the "special circumstances" requirements of Younger v. Harris, 1971, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669.

■ The district court held also that Title 42 U.S.C. § 1983 was an express exception to the anti-injunction statute, 28 U.S.C. § 2283. The Supreme Court has now confirmed the correctness of this view. Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705, 1972.

## I.   The Facts

Clay Shaw was active in business and civic affairs in New Orleans and for twenty years was Managing Director of the International Trade Mart, an organization for the promotion of business and cultural activities between New Orleans and foreign countries. The prosecution for perjury grew out of the State's unsuccessful attempt to convict Shaw of conspiracy to assassinate President John F. Kennedy. The State charged that Shaw, who took the stand in his own defense, perjured himself when he denied having known either Lee Harvey Oswald or David Ferrie, the alleged co-conspirators in the assassination plot. The plaintiff relies, in part, on the fear of multiple prosecutions, that is, the first was for conspiracy to assassinate President Kennedy; the second was for perjury; a third and fourth may be in store for him. The district court agreed with the plaintiff.[1] Based on the facts showing the district attorney's relentless harassment of Shaw, the trial judge could fairly infer that Shaw ran the risk of additional prosecutions. We feel, however, that it is unnecessary to go beyond the bad faith nature of the perjury prosecution to affirm the judgment. In reaching that conclusion we cannot ignore the first prosecution; that prosecution is an inseparable part of the factual

---

1. The district court found:

This court is not dealing with a single good-faith criminal prosecution wherein allegations of unconstitutional procedures are made. This court is dealing with a case of continuing harassment and multiple prosecutions, with the likelihood that such harassment and prosecution will continue in the future, unless abated by direct federal court intervention. Herein lies the unique nature of this case and the resulting impotency of traditional avenues of relief. If plaintiff is forced to stand trial for perjury, takes the stand and is acquitted, this court has no doubt but that plaintiff will be charged anew on the basis of statements made by him from the witness stand. A request for relief in this subsequent prosecution would be met with the same arguments put forth by the defendant in the instant proceeding and so on ad infinitum. Surely at some point plaintiff's precious constitutional rights must be vindicated. 328 F.Supp. at 403. Shaw testified:

Originally when I was charged, as you know, you, as my attorney, counseled me that I need not take the stand and that no inference would be drawn from the fact that I did not take the stand, but I knew I was not guilty of this charge, so I did take the stand, and then of course I was found not guilty, and then I found myself facing perjury charges arising out of my testimony given at the conspiracy trial. If I had not taken the stand, I would not be charged with perjury today, yet I took the stand in my own defense because I knew I was innocent.

Yet I was charged with perjury because of the very truthful testimony that I gave, and I see no reason to believe that if I take the stand in the new proceedings in my own defense and testify again truthfully as I did in the conspiracy trial the District Attorney will not have me reindicted for perjury for this testimony that I will give.

context within which the second prosecution should be considered. The perjury charge was based on Shaw's testimony in the conspiracy trial. Garrison's theory of the assassination and the trial itself were widely publicized. Whatever ambitions he may have had as the man who solved the Kennedy assassination crumbled to bits when the jury came in with a verdict of "not guilty".

On November 22, 1963, President John F. Kennedy was assassinated. Less than forty-eight hours later, Jack Ruby shot and killed the accused assassin, Lee Harvey Oswald. Oswald had spent the summer of 1963 in New Orleans. Learning of this, the district attorney for Orleans Parish conducted an investigation of Oswald's activities in New Orleans. As a result of this investigation, David Ferrie, allegedly an acquaintance of Oswald's, was arrested and turned over to the F.B.I. for questioning.[2] Ferrie died in February, 1967.

Not until November 1966 did Garrison resume his investigation of the Kennedy assassination. The resumption apparently was triggered by the release of the Warren Commission's report on the assassination. Garrison testified at the hearing below that "the Federal Government had not been looking into it [the assassination] honestly, and that it had been a fake investigation . . ."

Garrison first interviewed Shaw in connection with the investigation in December 1966. In his testimony in the district court Garrison offered no explanation for the initial interrogation of Shaw. On March 1, 1967, Shaw was arrested and charged with conspiracy to assassinate President Kennedy.

At the time of Shaw's arrest, according to James L. Alcock, Garrison's chief prosecuting attorney, the State's only witness against Shaw was Perry Raymond Russo. Garrison learned about Russo, and found him in Baton Rouge,

Louisiana, as the result of a newspaper article in which Russo was quoted as having made several statements concerning David Ferrie. After Assistant District Attorney Sciambra interviewed Russo in Baton Rouge, Garrison had Russo brought to New Orleans where he was given sodium pentothal, subjected to hypnosis, and again interrogated. Two days later, Shaw was arrested.

On March 1, 1969, a unanimous state court jury, after fifty-five minutes of deliberation, found Shaw not guilty of the charge that he conspired to assassinate President Kennedy. The verdict culminated a forty-day trial. On March 3, 1969, the next working day, Garrison signed an information charging Shaw with the crime of perjury. The information charged that Shaw perjured himself when, in testimony at the conspiracy trial, he denied having known David Ferrie or Lee Harvey Oswald.

### II. The Proceedings Below

On January 18, 1971, the date of the state court perjury trial, Shaw applied to the United States District Court for the Eastern District of Louisiana for a temporary restraining order enjoining Garrison from prosecuting the perjury charge. Shaw invoked jurisdiction under 28 U.S.C. §§ 1343(3) and 1343(4) for a cause of action based on 42 U.S.C. §§ 1983 and 1985 and "under the Constitution of the United States". Shaw alleged that he suffered and will continue to suffer "grave and irreparable injury" as the result of the state perjury prosecution brought in "bad faith" and "in furtherance of Garrison's scheme of harassment and intimidation of [Shaw]". The district court refused to issue a temporary restraining order, and Shaw applied to this Court for emergency relief. This Court ordered the district court to hold a hearing on Shaw's request for injunctive relief. Meanwhile, the state case was continued until January 20, 1971. On remand, the dis-

2. In his book, Heritage of Stone, an exhibit, Garrison states that his office had been informed that Oswald and Ferrie

were "associated together in the Civil Air Patrol" in New Orleans.

trict court issued a temporary restraining order pending a hearing on the preliminary injunction set for January 25, 1971.

The hearing lasted three days. The district court received fifty-five exhibits and heard eighteen witnesses on behalf of Shaw. Garrison offered no proof.[3]

### III. The Ruling Below

On May 27, 1971, the district court issued a permanent injunction "restraining Jim Garrison, District Attorney for the Parish of Orleans, his assistants, employees, agents and all persons in active concert and participation with him from further prosecution of the pending criminal action entitled " 'State of Louisiana v. Clay L. Shaw,' No. 208–260". 328 F.Supp. at 404. In a thoroughly considered opinion the experienced district judge made detailed findings of fact and conclusions of law. Characterizing the facts as "unique and bizarre", the court held: "[T]he perjury charge was brought in bad faith and for purposes of harassment . . . such bad faith constitutes irreparable injury which is great and immediate". 328 F. Supp. at 400. Thus, the court concluded that the " 'special circumstances' requirements of Younger"[4] were met and that Shaw was entitled to relief. 328 F.Supp. at 393.

The district court based its findings of bad faith and harassment on the history of Garrison's pursuit of Shaw, including the events leading to the state conspiracy trial as well as the events incident to the state perjury prosecution. As to Garrison's prosecution of Shaw for conspiracy, the district court found bad faith and harassment on the following facts:

(1) The court found a "serious question concerning the basis for Garrison's decision" to investigate the assassination of President Kennedy.

> Apparently, his jurisdiction was based on Oswald's activities in New Orleans in the summer of 1963. However, it is strange indeed that, nearly three years after the assassination, Garrison would decide to undertake an investigation of such gravity merely because he disagreed with the findings of the Warren Commission and Oswald had spent some time in New Orleans.

328 F.Supp. at 394. William A. Gurvich, an experienced investigator and Executive Director of an established detective agency in New Orleans, testified that Garrison solicited his help in conducting the investigation. He worked on this project for about six months. Gurvich testified that he resigned because he believed the investigation to be a "fraudulent, criminal act".

(2) There was no basis for Garrison's initial interrogation of Shaw. "Just how [Shaw] . . . was first selected to be interviewed by [Garrison] . . . when he was not a suspect is

---

3. As to Garrison's failure to offer proof, the district court said:
   > The burden of proof is, of course, upon the plaintiff Shaw to prove by a preponderance of the evidence the existence of exceptional and unusual circumstances that would justify this court's intervention. . . . When the plaintiff's evidence constitutes a prima facie case, the burden is on the defendant of going forward with any evidence to rebut the plaintiff's case. . . . In this case the defendant Garrison offered no proof, apparently relying on the supposed inability of Shaw to sustain his burden and that even if Shaw did, he would not be entitled to any relief by this court. In those instances where

the plaintiff proved certain facts by a preponderance of the credible evidence, and the defendant failed to rebut those facts either on cross-examination or by offering contrary evidence, this court has accepted those facts as true.
328 F.Supp. at 395.

4. Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Dyson v. Stein, 1971, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781.

another unanswered question in this case. [Garrison] . . . offered no evidence to show any basis or cause for his office's interrogation of [Shaw] . . . concerning such a shocking crime". 328 F.Supp. at 394.

(3) The extreme measures the state resorted to in extracting information from Perry Raymond Russo and the use of his testimony at the trial were incompatible with the American System of Justice. Russo was given sodium pentothal and subjected to hypnosis to "obtain a degree of corroboration" of what Russo had allegedly related to Garrison's assistant about a conspiratorial meeting. Yet the report of Garrison's assistant, Sciambra, who interviewed Russo, made no mention of any conspiratorial meeting involving Shaw. The district court stated:

> It should be borne in mind that the memorandum which [Garrison's assistant] . . . wrote on his return from Baton Rouge did not mention any such meeting . . . [S]ubstantial doubts are raised regarding the validity and objectivity of the state's case when a prosecuting attorney resorts to the use of such extraordinary tactics as were employed by Garrison on Russo. A fair inference to be drawn is that these *ex parte* procedures were used to implant into Russo's mind a story implicating the plaintiff in an alleged conspiracy plot. This could have been accom-

plished by post-hypnotic suggestion. This inference is supported by the fact that Garrison immediately moved to arrest and charge Shaw based solely on Russo's questionable, vague story. Such hasty action on the part of the defendant without submitting the matter, at that time, to the grand jury demonstrates ulterior motives.

328 F.Supp. at 395. Russo's testimony at trial was significantly different from the testimony he gave at the preliminary hearing. For instance, at the preliminary hearing Russo stated unequivocally that Shaw was present at a conspiratorial meeting; in the trial Russo was unable to identify Shaw as having been present at the alleged meeting.[5] In the trial in the district court Russo invoked his Fifth Amendment privilege when asked the precise questions he had previously answered in state court proceedings. The district court concluded:

> Normally no inference can be drawn when one invokes a right secured to him by the Constitution. However, in the circumstances of this case the court believes that it can and it does draw the narrow inference from Russo's action, that even today, he at least has substantial doubts as to the truthfulness of the testimony he gave in state court.

328 F.Supp. at 396.

(4) Garrison used funds received from private sources to pursue his investigation of Shaw. A group known as

---

5. Lieutenant O'Donnell a member of the New Orleans Police Department for nineteen years testified that he attempted to give Russo a lie detector test . . .
. . . It was not successful. However, O'Donnell stated he took the machine's attachment from Russo's body and continued on with the interview. According to O'Donnell, Russo told him that he did not know if Shaw was at David Ferrie's apartment the night of the alleged meeting to plot the assassination. Russo stated that if he were pressed for an answer, he would have to say that Shaw was not present. He further stated to O'Donnell that "he was under a great deal of pressure and that he was sorry that he ever got in-

volved in this mess". O'Donnell testified that he gave Garrison both an oral and written account of his interview with Russo. The written report was filed into evidence in this case by the plaintiff. O'Donnell said Garrison became enraged when he made his report and insinuated that O'Donnell had "sold out to the press or * * * to someone". The defendant Garrison did not make available to the plaintiff's counsel the report of Lt. O'Donnell. Instead, he withheld it despite the fact that its subject matter pertained directly to statements that were pertinent to the credibility of Russo, the only witness upon whose story Shaw had been arrested. 328 F.Supp. at 395–396.

"Truth or Consequences" was formed in February 1967 to solicit and contribute funds to Garrison's investigation. "The evidence is overwhelming that these funds were used in preparation for Shaw's conspiracy trial". 328 F.Supp. at 397. The group, all friends of Garrison, made it clear that they expected results. Garrison gave them results in the form of the prosecution of Clay Shaw—for conspiracy and for perjury.

(5) The manner of Shaw's arrest is described by the district court as follows:

Garrison carefully set the stage for Shaw's arrest, which took place at approximately 5:30 P.M., four and a half hours after Shaw voluntarily appeared in Garrison's office. During this time, a representative of Life Magazine photographed Shaw through a two-way mirror unbeknownst to him. The hallway outside the defendant's office on the second floor of the New Orleans Criminal Courts Building had mysteriously become congested with newsmen, photographers, television camera crews, and members of the general public. Shaw was led handcuffed into the hallway, where he was shoved and pushed through the crowd to reach an elevator leading to the basement of the building and then to Central Lockup. All of this appeared on television. Shaw could have been taken down in a private elevator located in Garrison's office, but this would not have afforded the publicity Garrison was obviously seeking. Shaw's arrest and the manner in which it was effected was outrageous and inexcusable. The only conclusion that can be drawn from Garrison's actions is that he intentionally used the arrest for his own purposes, with complete disregard for the rights of Clay Shaw. 328 F.Supp. at 399.

(6) Garrison's pretrial conduct showed a "total disregard of Shaw's rights". 328 F.Supp. at 399. He held press conferences and issued press releases during the pretrial period. Garrison even released information to the press that he had refused to give to Shaw. "[T]he action of Garrison in releasing information to the press while denying it to Shaw clearly reveals that . . . [Garrison] was not prosecuting Shaw in good faith". 328 F.Supp. at 399.

The district court also found bad faith and harassment in the events relating to the perjury prosecution.

(1) No witness who testified at the hearing before the district court, including Garrison, could recall an instance where a defendant *who took the stand* and was acquitted was later charged with perjury.

(2) No perjury charges were filed against State witnesses although their testimony at the conspiracy trial contradicted their testimony previously given.

(3) The chief prosecuting attorney at the state conspiracy trial testified that "at the time the perjury charge was filed there were no witnesses available other than those who were available at the conspiracy trial". 328 F.Supp. at 400.

(4) Garrison has a "significant financial interest in the continued prosecution of Clay Shaw":

Garrison's book, *Heritage of Stone*, concerns his investigation of President Kennedy's assassination. Defendant also has a contract to write three additional books. It is obvious that the sale of defendant's book may be promoted by the publicity resulting from the continued prosecution of Clay Shaw. It provides a means whereby defendant himself may profit, and also repay the substantial obligations owed to one of his financial backers. The court finds that this desire for financial gain is among the motives which prompt the continued prosecution of Clay Shaw. 328 F. Supp. at 400.

The State's case against Shaw for conspiracy to assassinate President Kennedy turned on the testimony of Perry

Russo. No one knew better than Garrison how unreliable Russo was. If he had ever any faith in Russo's credibility, it must have vanished when he heard Russo testify. Russo was equally important in the State's case against Shaw for perjury. And any hope of winning that case vanished when Russo, asserting his Fifth Amendment privilege, declined to answer any questions when put on the stand in the trial in the district court. In view of the extreme lengths Garrison went in the first place to "persuade" Russo to corroborate the alleged conspiracy theory, it is a fair inference that he knew Russo would be as ineffective in the second trial as he was in the first. Moreover, considering also the extreme lengths to which Garrison went for the purpose of "proving" his case, it is a fair inference that he well knew that Russo would take the Fifth.

## IV. Younger v. Harris: Comity Restraint on Injunctions Against Pending State Criminal Prosecutions.

Younger v. Harris and its companion cases define the contours of the "national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances". 401 U.S. at 41, 91 S.Ct. at 749, 27 L.Ed.2d 669.[6] As this Court has previously noted,

Younger and its accompanying opinions, while significant, do not represent startling new doctrines with respect to the proper role of a federal court in our system of federalism . . .

The opinion does not purport to extend beyond this traditional realm of comity and require across-the-board abdication of federal decisionmaking power in all manner of cases.

Hobbs v. Thompson, 5 Cir. 1971, 448 F. 2d 456, 465. In *Younger*, the Supreme Court defined the prerequisites—"special circumstances"—which must be present before a federal court will issue an injunction against a pending state criminal proceeding. Reviewing the prior cases, the Court concluded:

In all of these cases the Court stressed the importance of showing irreparable injury the traditional prerequisite to obtaining an injunction. In addition, however, the Court also made clear that in view of the fundamental policy against federal interference with state criminal prosecutions, even irreparable injury is insufficient unless it is "both great and immediate". 401 U.S. at 46, 91 S.Ct. at 751.

■■■ In the present case we are asked to clarify the meaning of "irreparable injury". Shaw argues that a

6. This underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. This, perhaps for lack of a better and clearer way to describe it, is referred to by many as "Our Federalism," and one familiar with the profound debates that ushered our Federal Constitution into existence is bound to respect those who remain loyal to the ideals and dreams of "Our Federalism." The concept does not mean blind deference to "States' Rights" any more than it means centralization of control over every important issue in our National Government and its courts. The Framers rejected both these courses. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States. It should never be forgotten that this slogan, "Our Federalism," born in the early struggling days of our Union of States, occupies a highly important place in our Nation's history and its future.

401 U.S. at 44–45, 91 S.Ct. at 750–751.

showing of bad faith prosecution or prosecution for the purpose of harassment establishes the requisite irreparable injury. Garrison, on the other hand, contends that a showing of bad faith or harassment is insufficient; he argues that irreparable injury must be independently established. We hold, as the language of *Younger* makes clear, that a showing of bad faith or harassment is equivalent to a showing of irreparable injury for purposes of the comity restraints defined in *Younger*, because there is a federal right to be free from bad faith prosecutions.[7] Irreparable injury need not be independently established.

In *Younger*, the Court repeatedly spoke of "good faith" and "bad faith" prosecution in such a manner as to indicate that a showing of bad faith was sufficient, although not necessary,[8] to establish irreparable injury. Quoting from Watson v. Buck, 1941, 313 U.S. 387, 400, 61 S.Ct. 962, 85 L.Ed. 1416, 1423, citing Beal v. Missouri Pacific Railroad Corp., 1941, 312 U.S. 45, 61 S. Ct. 418, 85 L.Ed. 577, 579, the Court said, " 'No citizen or member of the community is immune from prosecution, *in good faith*, for his alleged criminal acts'." 401 U.S. at 46, 91 S.Ct. at 751,

27 L.Ed.2d 669 (emphasis supplied). Similarly, quoting from Douglas v. City of Jeannette, 1943, 319 U.S. 157, 164, 63 S.Ct. 877, 87 L.Ed. 1324, 1330, the Court stated, " 'It does not appear from the record that petitioners have been threatened with any injury other than that incidental to every criminal proceeding brought lawfully and *in good faith* . . .' " 401 U.S. at 47, 91 S.Ct. at 752 (emphasis supplied). Also, in speaking of Dombrowski v. Pfister, 1965, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22, the Court said that the circumstances presented in that case "as viewed by the Court sufficiently establish the kind of irreparable injury, above and beyond that associated with the defense of a single prosecution brought *in good faith*, that had always been considered sufficient to justify federal intervention". 401 U.S. at 48, 91 S.Ct. at 752 (emphasis supplied).

The District Court, however, thought that the Dombrowski decision substantially broadened the availability of injunctions against state criminal prosecutions and that under that decision the federal courts may give equitable relief, without regard to any showing of *bad faith or harassment*,

---

7. Irreparable injury is not merely inferred; irreparable injury for the purposes of *Younger* is conclusively shown by a showing of bad faith or harassment.

8. There may, of course, be extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment. For example, as long ago as the *Buck* case, *supra*, [Watson v. Buck, 1941, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416] we indicated:

"It is of course conceivable that a statute might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it."

313 U.S., at 402, 61 S.Ct., at 967. Other unusual situations calling for federal intervention might also arise, but there is no point in our attempting now to specify what they might be.

401 U.S. at 53, 91 S.Ct. at 755. See also Younger v. Harris, *supra*, 401 U.S. at 54, 91 S.Ct. 746 (Stewart J., with whom Harlan, J. joined, concurring).

Bad-faith harassment can, of course, take many forms, including arrests and prosecutions under valid statutes where there is no reasonable hope of obtaining conviction, see e. g., Cameron v. Johnson, supra, 390 U.S. [611] at 621, 88 S.Ct. [1335] at 1340, 20 L.Ed.2d 182, and a pattern of discriminatory enforcement designed to inhibit the exercise of federal rights, see, e. g., Bailey v. Patterson, 323 F.2d 201 (CA 5 1963)".

Perez v. Ledesma, *supra*, 401 U.S. at 118, 91 S.Ct. at 693, 27 L.Ed.2d 701 (Brennan, J., with whom White, J. and Marshall, J. joined, concurring in part and dissenting in part). In Dyson v. Stein, the Court stressed that the existence of such irreparable injury was a matter to be determined carefully under the facts of each case. 401 U.S. at 203, 91 S.Ct. 769, 27 L.Ed.2d 781.

whenever a state statute is found "on its face" to be vague or overly broad, in violation of the First Amendment. 401 U.S. at 50, 91 S.Ct. at 753 (emphasis supplied).[9]

More importantly, in its discussion of the facts of the *Younger* case, the Court made clear the sufficiency of a finding of bad faith or harassment:

> There is no suggestion that this single prosecution against Harris is brought *in bad faith* or is only one of a series of repeated prosecutions to which he will be subjected . . . There may, of course, be extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of *bad faith and harassment*. . . . Harris has failed to make any showing of *bad faith, harassment, or any other unusual circumstance that would call for equitable relief*.

401 U.S. at 49–54, 91 S.Ct. at 753, 755 (emphasis supplied). Mr. Justice Stew-

art, joined by Mr. Justice Harlan, concurred, stating, "A threat of this nature [irreparable injury both great and immediate] might be shown . . . if there has been bad faith and harassment —official lawlessness—in a statute's enforcement . . ." 401 U.S. at 56, 91 S.Ct. at 757. Similarly, Mr. Justice Brennan, joined by Mr. Justice White and Mr. Justice Marshall, concurred in the result because Harris "has not alleged that the prosecution was brought in bad faith to harass him". 401 U.S. 56, 91 S.Ct. 755. Finally, Mr. Justice Douglas in dissent stated:

> The special circumstances when federal intervention in a state criminal proceeding is permissible are not restricted to bad faith on the part of state officials or the threat of multiple prosecutions. They also exist where for any reason the state statute being enforced is unconstitutional on its face.

401 U.S. at 59, 91 S.Ct. at 761.[10]

9. Speaking of Cameron v. Johnson, 1968, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182, the Court said:

> [A] divided Court denied an injunction after finding that the record did not establish the necessary bad faith and harassment; the dissenting Justices themselves stressed the very limited role to be allowed for federal injunctions against state criminal prosecutions and differed with the Court only on the question whether the particular facts of that case were sufficient to show that the prosecution was brought in bad faith.

401 U.S. at 49, 91 S.Ct. at 753.

10. In the companion case Perez v. Ledesma, 1971, 401 U.S. 82, 85, 91 S.Ct. 674, 677, 27 L.Ed.2d 701, 705, Mr. Justice Black, writing for the majority, said:

> Only in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate. See Younger v. Harris, supra; Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). There is nothing in the record before us

to suggest that Louisiana officials undertook these prosecutions other than in a good-faith attempt to enforce the State's criminal laws.

This Court has previously discussed this question. In Duncan · v. Perez, 5 Cir. 1971, 445 F.2d 557, 559–560, we said:

> We read Younger v. Harris to hold that an individual is not entitled to federal injunctive relief against a state prosecution which has been instituted by state officials in good faith unless irreparable injury to the state court defendant (as was shown in Dombrowski v. Pfister, 1965, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22) can be established. On the other hand, should the state court defendant be able to establish that the state prosecution has been instituted *in bad faith and for purposes of harassment*—as put by the concurring opinion in Younger v. Harris of Mr. Justice Brennan for himself and Justices White and Marshall, "official lawlessness"—irreparable injury need not be shown provided there is present a basis for federal jurisdiction, e. g. Title 28, U.S.C., Sec. 1343 and Title 42 U.S.C., Sec. 1983.

*See also* Hobbs v. Thompson, 5 Cir. 1971, 448 F.2d 456; LeFlore v. Robinson, 5 Cir. 1971, 446 F.2d 715 (Goldberg, J. concurring).

In the present case, the district court found that "the perjury charge was brought in bad faith and for purposes of harassment". 328 F.Supp. at 400. That finding is not "clearly erroneous". F.R.Civ.P. 52(a). *See* Duncan v. Perez, 5 Cir. 1971, 445 F.2d 557, 560. *See also* Taylor v. City of Selma, 327 F.Supp. 1191 (S.D.Ala.1971). Both were post-*Younger* cases. The finding of a bad faith prosecution establishes irreparable injury both great and immediate for purposes of the comity restraints discussed in *Younger*. We conclude that *Younger* presents no bar to the issuance of an injunction.[11]

The decision of the district court enjoining Garrison from further prosecution of the pending state perjury proceeding against Shaw is affirmed.[12]

11. *Younger* and its companion cases note that the threat of "repeated prosecutions", 401 U.S. at 49, 91 S.Ct. at 746, may fulfill the "special circumstances" requirement. A showing of such a threat, while one alternative path to federal injunctive relief, is not necessary where bad faith or harassment is established.

In addition, the Court stated in *Younger* that "the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution". 401 U.S. at 46, 91 S.Ct. at 751. When the federal right sought to be protected is the right not to be subjected to a bad faith prosecution or a prosecution brought for purposes of harassment, the right cannot be vindicated by undergoing the prosecution.

12. Garrison argues that the "bias and prejudice" of the trial judge require reversal. This contention is totally without merit.