**Paul C. TATE, Jr., Plaintiff–Appellant,**

v.

**John Ed BRADLEY and The Washington Post Company, Defendants–Appellees.**

**No. 87–4175.**

United States Court of Appeals, Fifth Circuit.

Feb. 10, 1988.

pipeline contract. 15 U.S.C. § 3414(a) (1982).

Paul C. Tate, Jr., Mamou, La., Kenneth W. DeJean, Lafayette, La., for plaintiff-appellant.

Kevin T. Baine, Jeffrey B. Kindler, Washington, D.C., Patrick T. Caffery, New Iberia, La., for defendants-appellees.

Before WISDOM, GARWOOD, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Appellant Tate filed suit to rectify what he viewed as defamation by Appellees John

Ed Bradley and *The Washington Post* in their depiction of him as a Mardi Gras merrymaker. The newspaper article, carried as a human-interest feature, was titled "Cajun Mardi Gras—The Native Returns for Raucous Rights" and recounted the events of Mardi Gras 1984 in the heart of Acadian Louisiana, from the perspective of a recently-departed native son. Tate objected to the following excerpt:

The gravel road cuts through a dried-out soybean field and a crawfish farm. The courir stops to eat links of boudin (red-hot Cajun sausage) and hard-boiled eggs. The native says it has been over 13 months since he's eaten boudin.

"People don't know what tastes good up dare, do dey?" says Paul Tate Jr., whose father had helped found both Mamou's and Church Point's Official Courir de Mardi Gras almost 25 years ago.

The native shakes his head no and asks for another beer.

"You get north of Shreveport and you lose the South," Tate says. "All you got is Americans up dare. Well, I'm an American, but I'm a Cajun first. Americans look down on anyone who doesn't speak their own language. But you know what you can do, Coonass? You can just tell America that we're French and we're proud. Tell America a Coonass ain't nothing to be ashamed of. They ran our ancestors out of Acadia [Canada] for political reasons but we got a home here in Loozianne. So go back, you. And take your time. But tell 'em we'll live here forever."

The district court granted summary judgment to Appellees on the basis that Tate is a "public figure" [1] who must satisfy the *New York Times v. Sullivan* [2] standard of constitutional malice in order to recover for defamation. Alternatively, the court ruled that Tate could not make out his case under Louisiana defamation law. We find the latter ground of decision alone sufficient and affirm.

---

1. See *Curtis Publishing Co. v. Butts and Associated Press v. Walker*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

2. *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

■ Defamation requires proof of five elements in Louisiana law: (1) defamatory words; (2) publication; (3) falsity; (4) actual or implied malice; and (5) injury. *Carter v. Catfish Cabin*, 316 So.2d 517, 521 (La.App.1975). Louisiana courts have distinguished between a publication that is defamatory and one which is defamatory per se. Actual malice, in the sense of spite or ill will, is presumed and need not be proved if the words are on their face defamatory per se. *Id.* at 521–22. Tate has conceded that the author and publisher of "Cajun Mardi Gras" were not motivated by spite or ill will. Consequently, the only issue we must address is whether the article's reference to Tate may be considered defamatory per se.

The Louisiana Supreme Court in *Madison v. Bolton*, 234 La. 997, 102 So.2d 433 (1958), most fully defined defamation and distinguished "mere" defamation from defamation per se:

In a general and comprehensive sense, libel is the defamation of a person by the publication of any false and unprivileged writing which tends to expose him to contempt, hatred, ridicule or obloquy; or which causes him to be shunned or avoided; or which has a tendency to deprive him of the benefits of public confidence or injure him in his occupation; and includes almost any language which upon its face has a natural tendency to injure the person's reputation, either generally or with respect to his occupation.... *Words charged to be libelous have been classified as those that are susceptible of a defamatory meaning and those that are indisputably defamatory on their face. In the latter category they are actionable per se;* they impute to the person the commission of a crime or subject him to public ridicule, ignominy or disgrace, and are susceptible of but one meaning. Words not actionable per se fall short of those requirements, and are found in numerous categories, among which are words that are actionable only in consequence of extrinsic facts, in which case the surrounding circumstances and conditions must be taken into account to determine the matter, or statements that contain language which unjustifiably tends to injure the reputation of a person, or reflect shame and disgrace upon him. The intent and meaning of an alleged defamatory statement must be gathered not only from the words singled out as libelous, but from the context as well, and the true meaning must be ascertained from a consideration of all parts of the statement as well as the circumstances of its publication. "The test is the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate." *Boyer v. Pitt. Pub. Co.*, 324 Pa. 154, 188 A. 203, 204.

*Id.*, 102 So.2d at 437–38 (emphasis added; footnote omitted).[3] Whether the challenged words are defamatory per se is a question of law for the court. *Kihneman v. Humble Oil & Refining Co.*, 312 F.Supp. 34, 42 (E.D.La.1970).

In *Madison*, a false accusation of criminal activity was held defamatory per se. See also *Freeman v. Cooper*, 414 So.2d 355 (La.1982) (false accusation of a lawyer's lying to the court and attempting to suborn a new judge defamatory per se); *Garrett v. Kneass*, 482 So.2d 876, 880 (La.App.1986) (false accusation of threats on a political candidate's family defamatory per se); *Parsons v. Gulf & South American Steamship Co.*, 194 So.2d 456 (La.App.), cert. denied, 389 U.S. 896, 88 S.Ct. 215, 19 L.Ed.2d 213 (1967) (imputing the commission of a criminal offense is defamatory per se); *Goldsmith v. Unity Ind. Life Ins. & Sick Benefit Ass'n*, 13 La.App. 448, 128 So. 182 (1930) (imputing loathesome disease or sexual misconduct is defamatory per se). Other Louisiana cases have determined that the use of common epithets such as "thug" and "SOB" [not abbreviated] are not defamatory. *Garrett*, 482 So.2d at 879; *Harris v. Levy*, 353 So.2d 1065 (La.App. 1977). More to the point, a newspaper editorial that criticized the operation of a

---

**3.** *Makofsky v. Cunningham,* 576 F.2d 1223, 1236 n. 23 (5th Cir.1978), explains some semantic confusion in the Louisiana Supreme Court's language in *Madison.*

local government office and described its ousted directed as being most upset about "losing his fat pay," was characterized by a Louisiana court as harsh, caustic, and perhaps crude, but not capable of a defamatory meaning. *Brown v. News–World Publishing Corp.*, 245 So.2d 430, 433 (La. App.1971).

■ Tate alleges that he has been defamed as a fool rather than, as in several of the above-cited cases, a crook. According to his brief and three identically worded affidavits of his friends, the *Washington Post* article "depicted him as ignorant, belligerent, and inarticulate, which are not character traits of [Tate]." He objects particularly to the article's description of his accent (using "d" where "th" is called for), the ungrammatical syntax reported, and the attribution of his use of the expression "coonass." Tate asked rhetorically what more can be required in a defamation action than to be ridiculed in one's speech, appreciation of the English language and ability to intelligently converse with a reporter. We would respond by reference to Louisiana law: a lot more.

Although one man's sense of local color may be another man's vulgar insult, the above cases show that Louisiana law has clearly differentiated remarks that are simply, generically insulting from those that are so harmful as to be defamatory per se. "Cajun Mardi Gras" does not hold Tate up to public ridicule, even if he considers himself unfairly portrayed or misquoted.[4] Viewed as a whole, as *Madison* requires, 102 So.2d at 438, the article warmly and affectionately attempts to describe the ambience and events surrounding a Cajun Mardi Gras. Numerous local characters are introduced to the reader by their real-life names, but the article's tale of their sometimes outrageous doings must be interpreted in its proper context. As the author repeatedly explains, and Tate in his deposition agreed, Mardi Gras represents a deviation from everyday Cajun life, when all Hades breaks loose in final revelry before Ash Wednesday commences the Lenten season. Presumably, the reader understands that few of the characters would act or even speak the same way the rest of the year as they are reported to do during Mardi Gras. In this context, the quotations attributed to Tate, far from demeaning him, epitomize the Cajun attitude of pride in a unique background and tradition.[5] Tate is the last local citizen quoted in the article, and his thoughts appear to mirror the author's evident attachment to his homeland.

Because the substance of the article is not defamatory per se, it follows that the author's quotation of Tate's alleged Cajun accent (substituting "d" for "th") and syntax are not actionable. The article suggests nothing derogatory by the use of a Cajun dialect, although Tate disclaims speaking English that way. Tate admitted that many Cajuns speak in just the manner attributed to him by the article and would not find its dialogue offensive. Likewise, even if Tate declines to use the term "coonass" to describe Cajuns, its attribution to him cannot be defamatory per se. Tate admitted during oral argument to this court that "coonass" is a common expression of pride and endearment among Cajuns and is not generally understood to connote a racial or ethnic slur. "Coonass" is no more defamatory than describing a graduate of Texas A & M University as an "Aggie."

Tate's complaint rests essentially upon extrinsic circumstances and so further undermines his claim that the quotations attributed to him are defamatory per se. The affidavits of Tate's friends confirm the extrinsic focus and personalize the article as defamatory to "a man in [Tate's] position." If the reader knows that Tate is a lawyer, that he has a reputation as a spokesman and advocate of Cajun culture, and that he strenuously advocates the preservation of classical French in Louisiana, as opposed to the Cajun version of French,

---

**4.** In Tate's extensive deposition, he admitted that the only substantive misquotation by Bradley was Tate's alleged use of the term "coonass."

**5.** Tate agreed in his deposition that the way he was quoted would not offend or defame many other Cajuns.

then the reader might interpret Bradley's article as satirical of Tate. This is by no means the best or most likely interpretation, we hasten to add. Ignorant of these extrinsic facts, however, which are nowhere mentioned in the article, the average reader does not naturally understand it as defamatory. See *Madison,* 102 So.2d at 437–38.

Because the quotations and accent attributed to Tate in "Cajun Mardi Gras" were not defamatory per se under the Louisiana law, the judgment of the trial court is AFFIRMED.