Perry RUSSO

v.

CONDE NAST PUBLICATIONS d/b/a Gentlemen's Quarterly.

Civ. A. No. 92–1219.

United States District Court, E.D. Louisiana.

Nov. 17, 1992.

---

Mark Samuel Goldstein, Dennis Stewart Mann, Howard, Laudumiey, Mann, Reed & Goldstein, New Orleans, La., for plaintiff.

Jack M. Weiss, Mark Benjamin Holton, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., for defendant.

## ORDER AND REASONS

CHARLES SCHWARTZ, Jr., District Judge.

Before the Court is the defendant Gentleman's Quarterly ("GQ's") Motion for Summary Judgment pursuant to F.R.C.P. Rule 56 dismissing plaintiff's claims against it in the captioned matter with prejudice. Pursuant to the agreement of the parties this matter was deemed submitted on the briefs as of November 4, 1992.

Plaintiff Perry Raymond Russo ("Russo") has asserted claims pursuant to both state and federal law for defamation on the basis that a GQ article (i.e., an Advance magazine) described Russo, the prosecution's star witness in the 1969 case against Clay Shaw for conspiracy to assassinate President John F. Kennedy ("JFK"), as an "insurance salesman-cum-grifter."

UNDISPUTED FACTUAL BACKGROUND:

In its January, 1992 issue, GQ Magazine published an article entitled "The Case Against Jim Garrison" (hereafter the "GQ article"). The GQ article was written by Nicholas B. Lemann, a New Orleans native and winner of numerous awards for his books and articles. The GQ article was a personal memoir[1] of Lemann's recollections of growing up in New Orleans during District Attorney Jim Garrison's prosecu-

tion of Clay Shaw for allegedly conspiring to assassinate JFK.

The 1991 movie release, *JFK* sparked renewed interest in the assassination as well as the prosecution itself of Clay Shaw. The film was purportedly based on Garrison's book, *On the Trail of Assassins,* and sympathetically portrayed Garrison.

The GQ article published by Lemann took a different slant, expressing his view that Shaw's prosecution was built on flimsy evidence and was a tremendous embarrassment to the city.[2] The thrust of Lemann's article was his *opinion* countering that expressed by Stone in his film release *JFK,* to wit:

Garrison was a public official who had prosecutorial power in his hands, and he used it to bring a man to trial when, by his own admission, he knew he didn't have a real case. With his use of innuendo, his carelessness in flinging the gravest of charges against people, his belief that individual liberties (at least, Clay Shaw's individual liberties) are less important than his attack on what he imagines to be a vast conspiracy destroying America....

\* \* \* \* \* \*

Not only is the Garrison–Stone case for the greater importance of the Kennedy assassination essentially a fantasy, its strange that they feel it has to be made at all.... Garrison and Stone are trying to make it into something more: the main turning point in American history— which it wasn't. Garrison, for all these years, has been engaged in a witch-hunt, not a genuine attempt to solve a crime. Like all witch hunts, his has been based on the idea that some vast, mysterious evil has society in its grip. If the sense

---

**1.** The first paragraph of Lemann's article, written in the first person, identifies it as his personal memoir of the Shaw prosecution:

I know life is supposed to be full of surprises, but sometimes one comes along that exceeds the limit of what you should have to put up with. I never thought that I'd see someone make an all-out effort to rehabilitate Jim Garrison, the six-foot-seven, booming-voiced district attorney of New Orleans during the years I was growing up there, and the only man to prosecute someone for conspiring to assassi-

nate John F. Kennedy. Garrison lost his case after one hour of jury deliberation. The responsible wing of the assassination-conspiracy community—meaning writer-investigators, such as Harold Weisberg and Edward Jay Epstein—has regarded him as an embarrassment for nearly a quarter-century.

**2.** See, GQ article wherein it is stated: "New Orleans was becoming known as the weirdo capital of the United States."

of pervasive corruption isn't there, then Garrison's mission (and, even more, his method) somehow completely loses its aura of virtue.[3]

The entirety of the GQ article contains *only one reference* to Russo, who was Garrison's principal witness against Shaw in his 1969 prosecution, to wit:

> **Garrison** presents the masterminds of the Kennedy assassination as being extremely far-reaching and clever—and yet, oddly enough, they were constantly making little mistakes that allowed Garrison to pick up their trail. Take the Clay Shaw trial. The obvious question was, Why didn't the conspirators entrust the hit to a more reliable crew? *Garrison's key witness against Shaw, Perry Russo, was a young insurance salesman-cum-grifter who claimed to have overheard Shaw and Ferrie discussing the assassination at a party.* Another witness, named Charles Speisel—a paranoid accountant who regularly fingerprinted his own children and claimed to have been hypnotized by people on the street dozens of times—told a similar story about overhearing Shaw and Ferrie casually planning Kennedy's murder at a different party.[4]

The record of the Shaw proceedings, contemporaneous news accounts, books and magazine articles, and the findings of the court in *Shaw v. Garrison*, 328 F.Supp. 390 (E.D.La.1971) (Christenberry, J.), *aff'd*, 467 F.2d 113 (5th Cir.1972) (Wisdom, J.), confirm that Russo's testimony in the Shaw case was controversial and widely regarded as unreliable.

Judge Wisdom recounted the facts as follows:

> At the time of Shaw's arrest, according to James L. Alcock, Garrison's chief prosecuting attorney, the State's only witness against Shaw was Perry Raymond Russo. Garrison learned about Russo, and found him in Baton Rouge, Louisiana, as the result of a newspaper article in which Russo was quoted as having made several statements concerning David Ferrie. After Assistant District Attorney Sciambra interviewed Russo in Baton Rouge, Garrison had Russo brought to New Orleans where he was given sodium pentothal, subjected to hypnosis, and again interrogated. Two days later Shaw was arrested. 467 F.2d at 115.

In *Shaw v. Garrison*, 328 F.Supp. 390 (E.D.La.1971) Judge Christenberry stated his findings as follows:

> Sciambra wrote two memoranda of the Baton Rouge meeting with Russo, one of which was introduced into evidence. In the memorandum filed into evidence, no mention was made of any conspiratorial meeting to assassinate the President. The following Monday, February 27th, two days before Shaw's arrest, Russo came to New Orleans. At the instruction of the defendant, he was subjected to Sodium Pentothal ... and hypnosis.... The defendant stated the purpose of these strange procedures was "to obtain a degree of corroboration" of what Russo had related to Sciambra in Baton Rouge of a New Orleans conspiratorial meeting between the plaintiff, Ferrie and Oswald.... [S]ubstantial doubts are raised regarding the validity of the state's case when a prosecuting attorney resorts to the use of such extraordinary tactics as were employed by Garrison on Russo. A fair inference to be drawn is that these *ex parte* procedures were used to implant into Russo's mind a story implicating the plaintiff in an alleged conspiracy plot.... This inference is supported by the fact that Garrison immediately moved to arrest and charge Shaw based solely on Russo's questionable, vague story....
>
> \*   \*   \*   \*   \*   \*
>
> The lack of substance of Russo's story is emphasized by several events which occurred subsequent to Shaw's arrest. At Shaw's conspiracy trial, Russo's testimony differed materially from that which he gave at a preliminary hearing

---

**3.** *Id.*

**4.** See, GQ Article (emphasis added) [Defendant's Exhibit "4"].

prior to trial. The most salient change in his testimony was his inability at trial to identify the plaintiff as having been present at an alleged conspiratorial meeting in New Orleans. At the preliminary hearing he stated unequivocally that the plaintiff Shaw was present....

\* \* \* \* \* \*

The defendant testified that in 1967 he believed Russo's story.... Apparently Russo himself does not share this belief. After having testified previously both at a preliminary hearing and at the conspiracy trial in state court, Russo, at the hearing in this court, invoked the protection afforded by the Fifth Amendment ... and refused to testify when asked precise question he previously answered in the state proceedings....

\* \* \* \* \* \*

... All of these actions considered with the subsequent doubtfulness on the part of Russo as a witness show clearly that the defendant Garrison did not act in good faith regarding Russo's story. Garrison was aware of Russo's unreliability from Sciambra's first interview.... 328 F.Supp. at 396.

In the case at bar, the Court notes that the plaintiff in opposing summary judgment did not take issue with or dispute the plethora of the evidence submitted by Advance which clearly shows both Russo's substantial involvement in the prosecution of Clay Shaw and the *unreliability* of his conflicting testimony during those proceedings.

It is uncontroverted that Lemann did not know Russo personally and had never met with him.[5] There is not a shred of evidence which suggests either Lemann himself or anyone else at GQ harbored any feelings of

ill will or spite towards Russo.[6] Lemann testified in deposition that his sole reference to Perry Russo was a reference to "his [Russo's] public reputation, how he came across as a public figure."[7] When Russo was questioned in deposition as to whether he had any reason to believe that Lemann or any one at GQ harbored any animosity toward him, he essentially admitted that he had no reason to believe that either were out to hurt him, to wit:

Q. Do you have any reason to believe that Mr. Lemann has any animosity toward you or bad feelings toward you other than the fact, the mere fact of publication of the article?

A. As a personal thing, no, but I've always felt that those that were— that would purport to write stories of Garrison's case were after Garrison. And to be after Garrison meant to attack whatever Garrison based his case upon. And one of the witnesses in that case is myself—in that case was myself. And so to dismiss me as a grifter, *he had no personal thing against me* but he does intend to destroy Garrison's image or the legacy of Garrison. And so the best way would be to destroy me in the process.

Q. Well, do you have any facts upon which you base you suggestion that Mr. Lemann was out to destroy Garrison's image other than this article?

A. *No.*

Q. And how about G.Q. Magazine? Do you know or have you ever had any dealings with anybody connected with G.Q. Magazine or the people that publish G.Q. Magazine that would lead you to believe that they

---

**5.** See, Deposition of Lemann, at p. 20.

**6.** In opposition to the statement of uncontested fact that Lemann harbored no feelings of ill will or spite, plaintiff herein directs the Court's attention to pages 21–22, 29 and 75–76 of Lemann's deposition. A careful reading of those passages of the Lemann deposition simply reflects Lemann's opinion, based upon years of extensive research, that Garrison had no credible basis for prosecuting Clay Shaw and that Russo's pivotal role in the prosecution was well-

known and controversial. There is no indication therein that Lemann harbored any feelings of ill will, spite or malice toward Russo. In other words, the summary judgment record is devoid of any evidence of malice or ill will on the part of Lemann directed toward the controversial figure Russo.

**7.** Lemann Deposition at p. 20 [Defendant's Exhibit 1].

had anything in for you or that they had any reason to try to hurt you?

A. *No.*[8]

As to the slang term "grifter", it unquestionably has a wide variety of connotations which largely depend on the context of the terms usage. The numerous definitions of "grifter" include but are not limited to the following: gambler,[9] confidence man,[10] swindler,[11] person who operates a sideshow at a circus,[12] and dishonest person.[13]

By his solo reference to Russo, describing him as a "young insurance saleman-cum-grifter", Lemann intended to communicate both the longstanding controversy over Russo's testimony against Shaw, and Russo's admittedly strange existence on the fringes of respectable society.[14]

Turning to Russo's critical role in the prosecution of Clay Shaw and life in the limelight, in February of 1967 this young insurance salesman captured the attention of Garrison and thereafter the public eye by seeking out an interview with the Baton Rouge newspaper.[15] Russo was interviewed by reporter Bill Bankston, who wrote an article for publication in the afternoon paper, the *States–Times*, for February 24, 1967. The article bore the headline, "Local Man Reports Ferrie Threat on Life of Kennedy." The article was accompanied by a photograph of Russo. [Defendant's Exhibit 15]. Unquestionably, Russo

sought out this first interview which involved him in the Garrison investigation.[16]

Russo also gave an interview with at least two television stations, WAFB–TV (Baton Rouge) and WDSU–TV (New Orleans), before his first contact with Garrison's assistants.[17] Subsequent to the Baton Rouge newspaper article appearing, Russo was "hounded to death by the local news media."[18] From the time Russo came forward, he was caught up in the Shaw case for a period of months, if not years.[19]

Initially, Russo was instructed by Garrison's office not give interviews, except when approved by Garrison, Russo did so.[20] As early as March 1, 1967, Russo was again before television cameras—this time for Channel 12 WVUE–TV, New Orleans. Later in 1967, in the midst of his involvement as Garrison's star witness against Shaw, Russo was lecturing to civic groups including the Lions' Club and the Optimists' Club, the subject of which were the Shaw prosecution, and the tactics he expected Shaw's attorneys to employ to discredit him on the witness stand. [Defendant's Exh. 16].

It is clear from the trial record, that Russo was interviewed at length by James Phelan for the *Saturday Evening Post*.[21] Since 1969, Russo admits having given

8. Deposition of Perry Russo at pp. 140–141 (emphasis added) [Defendant's Exhibit 7].

9. *Dictionary of American Slang* (1975) [Defendant's Exhibit 14].

10. *Id.*

11. *Webster's College Dictionary* (1991).

12. *Id.*

13. *The Contemporary Dictionary of American Slang* (1990) [Defendant's Exhibit 14].

14. See Deposition of Lemann, at pp. 23–23.

15. Russo testified in deposition that when he heard Garrison was conducting an investigation of the assassination of JFK, he contacted the East Baton Rouge Sheriff's Department and wrote a letter to the D.A.'s office. Considering himself to be in possession of concerning Garri-

son's probe, Russo sought out an interview with the Baton Rouge newspaper. See, Deposition of Perry Russo at pp. 81–83, 89–90, 99 [Defendant's Exhibit 7].

16. *Id.* at 206–207.

17. *Id.* at 95–97.

18. Sciambra Memo, at p. 1 [Defendant's Exhibit 8].

19. Deposition of Russo, at p. 101.

20. Russo testified in deposition at p. 104: "From time to time, Garrison's people would contact me and they would tell me that so-and-so wants to interview me about—concerning these items and that Garrison wants me to give that interview."

21. See Excerpts of *State v. Shaw* Trial Transcript, at 72, 282 [Defendant's Exh. 6]. See also

somewhere between ten and one hundred interviews.[22] Russo has most recently appeared as an interviewee in a public television documentary on the Shaw trial, "He Must Have Something" broadcast in 1992. [Defendant's Exhibit 17].

Russo has accepted money as payment for consulting work relating to the Shaw matter.[23] He admits consulting with Stone's people prior to the movie release *JFK*.[24] Russo himself even appeared in the first scene of the movie as an actor.[25]

As to Russo's work history, within a week of being interviewed by D.A. Sciambra in February 1967, Russo stopped working for Equitable Life and never returned.[26] During the pendency of the Shaw case and for sometime thereafter, Russo was not regularly employed anywhere.[27] Russo finally resumed employment in about 1973, when he joined Yellow Cab. Since that time he has driven a cab, although he is now affiliated with United Cab Company.[28]

THE LAW:

■ To maintain an action in defamation in Louisiana, the plaintiff must prove the following elements: (1) defamatory words; (2) publication; (3) falsity; (4) malice, actual or implied; and (5) resulting injury.[29] In addition to the state law elements aforementioned, the plaintiff must also satisfy federal constitutional requirements imposed on all defamation claims.[30] The threshold issue in a defamation action such as this one is whether the statements complained of are defamatory.[31]

■ Words are only defamatory *per se* if: (1) they impute the commission of crime or subject a person to public disgrace; *and* (2) they are *susceptible to but one meaning*.[32] Considering the many slang meanings of the term "grifter", some of which were reiterated above and which do *not* explicitly impute the commission of a crime or even constitute strong insults, there is no doubt that, as a matter of law, "grifter" is not defamatory *per se*.[33] Russo's complaint rests essentially upon extrinsic circumstances which undermines his claim that the term "grifter" is defamatory per se.

■ Because the term "grifter" is not defamatory *per se*, the plaintiff must demonstrate ordinary malice, i.e., spite or ill will, toward him on the part of the defendant.[34] Plaintiff's attempt to metamorphose spite or ill will allegedly directed against the late Jim Garrison into spite or ill will also levied at Russo simply does not suffice. As mentioned above in the foregoing section of this opinion entitled undisputed facts, Lemann never met or personally knew Russo. Moreover, Russo himself admitted that he had no basis for believing that either Lemann or Advance were motivated by hostility even toward Mr. Garrison.

Lemann's deposition testimony cited by plaintiff merely reflects Lemann's opinion

---

Excerpts of *American Grotesque* by James Kirkwood, at p. 76 [Defendant's Exhibit 2].

22. Deposition of Perry Russo, at pp. 105–106.

23. *Id.* at pp. 113–115.

24. Russo was paid $4500 to be a consultant to director Oliver Stone for the movie *JFK*, for which he entered into a written contract with the producers. [Defendant's Exhibit 18].

25. Deposition of Perry Russo, at pp. 110–111.

26. *Id.* at p. 19.

27. *Id.* at p. 25.

28. *Id.* at p. 30.

29. *Brannan v. Wyeth Laboratories, Inc.,* 526 So.2d 1101 (La.1988); *Lemeshewsky v. Dumaine,* 464 So.2d 973 (La.App. 4th Cir.1985).

30. *See Tate v. Bradley,* 679 F.Supp. 608, 610 (W.D.La.1987), *aff'd.* 837 F.2d 206 (5th Cir.1988) (holding that where the plaintiff is a "public figure", he must prove that the defendant acted with actual malice in addition to proving the five elements of fault required under Louisiana law.

31. *Carter v. Catfish Cabin,* 316 So.2d 517 (La. App. 2nd Cir.1975).

32. *Madison v. Bolton,* 234 La. 997, 102 So.2d 433, 438 (1958).

33. Whether a statement is capable of a defamatory meaning is a question of law to be determined by the court. *Ryan v. The Shreveport Times Publishing Co.,* 344 So.2d 114, 117 (La. App. 2nd Cir.1977).

34. *Tate v. Bradley,* 837 F.2d 206, 208 (5th Cir. 1988).

that Garrison had no credible basis for prosecuting Clay Shaw and that Russo's star role in the prosecution was well-known and controversial. Thus, even if Mr. Lemann's alleged malice toward Garrison could be deemed as also directed towards Russo, the plaintiff's proffered "evidence" of any such malice is non-existent and therefore insufficient to withstand summary judgment.

■ In addition to this Court's opinion that the term "grifter" is not defamatory per se, the Court is further of the opinion that such term while unflattering is not defamatory as a matter of law. Louisiana courts have acknowledged the important distinction between unflattering remarks and those which are defamatory.[35]

In the instant case, the description "grifter" is informal in nature, and does not make a specific charge of any kind concerning Russo. Although there is no question but that the term does not constitute flattery as the various and sundry slang definitions do not conjure up complimentary innuendos, it is not in this Court's opinion a defamatory statement in and of itself. Here the Court points out that other than the hyphenated capsule description of Russo as "an insurance salesman-cum-grifter" there was no further mention of Russo throughout the entirety of the lengthy GQ article penned by Lemann.

Even if this Court were to accept plaintiff's proposition that "grifter" in the context it was used means "con man", it is undisputed that Russo's role in history is that of a testimonial con man. As previously mentioned, the plaintiff did not dispute his long-lived involvement in the prosecution of Clay Shaw and the unreliability of his conflicting testimony during the Shaw proceedings. The unreliability of his testimony has been the subject of prior reported opinions[36] discussed extensively above. It is clearly undisputed that Russo voluntarily submitted to questioning under hypnosis and sodium pentothal to "enhance" his memory of significant events; changed his testimony during the prosecution of Clay Shaw for conspiring to assassinate President Kennedy; and later, when asked to testify regarding precisely the same matters during a subsequent federal proceeding, invoked the Fifth Amendment.

■ Given the *enormous public attention* which was focussed on the controversy surrounding the prosecution of Clay Shaw *and* Russo's pivotal role in that prosecution, the Court is further of the opinion that Russo is a limited purpose public figure under the test[37] enunciated by the Fifth Circuit in *Trotter v. Jack Anderson Enterprises, Inc.*, 818 F.2d 431 (5th Cir. 1987).[38] The plaintiff in the case at bar does not dispute the detailed evidence submitted by Advance which clearly shows that Russo has been the subject of media attention for the past 25 years. There is no question that Russo from the outset, voluntarily stepped forward, sought the limelight and has continued to do so up to the present time. Borrowing language

---

**35.** *Kihneman v. Humble,* 312 F.Supp. 34, 42 (E.D.La.1970) (held the term "unwitting tool" could be read scornfully but nonetheless not defamatory because it did not accuse the plaintiff of serious wrongdoing); *Garrett v. Kneass,* 482 So.2d 876 (La.App. 2nd Cir.1986), *cert. denied,* 484 So.2d 671 (La.1986) (held the term "thug" was not defamatory since it does not impute any particular crime to the plaintiff, it is informal and does not rise to the level of contempt or hatred); *Curtis Publishing Co. v. Birdsong,* 360 F.2d 344 (5th Cir.1966) (held the characterization of state police officers as "bastards" was not defamatory); *Autry v. Woodall,* 493 So.2d 716 (La.App. 2nd Cir.1986) (held the term "vindictive" not defamatory); and *Heft v. Burk,* 304 So.2d 670 (La.1974) (held the description of plaintiff's conduct as "unethical" not defamatory).

**36.** See text supra at pp. 4–5.

**37.** The *Trotter* court enunciated the following test for determining whether a plaintiff is a limited purpose public figure required to demonstrate actual malice in a libel action: (1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in controversy are likely to feel impact of its resolution; (2) plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy. 818 F.2d at 433.

**38.** Contrary to the plaintiff's suggestion, the determination of public figure status is not a question of fact but a question of law for the court. *Trotter v. Jack Anderson Enterprises, Inc.,* 818 F.2d 431, 433 (5th Cir.1987).

from the Fifth Circuit in *Trotter,* Russo thrusted himself into the forefront of the Garrison probe. ·In other words, he voluntarily injected himself into that controversy regarding an alleged conspiracy to assassinate JFK. His pivotal role in the Clay Shaw trial as the prosecution's key witness is similarly uncontroverted.

Russo has suggested in opposition memorandum that the alleged defamation was not germane to his participation in the prosecution of Clay Shaw. The Court disagrees and is rather of the opinion that Lemann's capsule description of Russo expressed his [Lemann's] opinion as to Russo's fitness as the key witness in the trial of an individual accused of conspiring to assassinate the President of the United States.

Inasmuch as Russo is a limited purpose public figure, he is required to demonstrate, at the summary judgment stage of the case, that there is sufficient proof to permit the Court[39] to conclude by clear and convincing evidence, that Advance acted with constitutional malice. Plaintiff's submissions in this regard, discussed above, are woefully insufficient to withstand summary judgment.

In *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), the Supreme Court stated the rule which is dispositive of this case, to wit:

> In cases ... where the nonmoving party will bear the burden of proof at trial on a dispositive issue, ... Rule 56(e) requires the nonmoving party to go beyond the pleadings and by ... affidavits ... or depositions, answers to interrogatories, and admissions on file, designate specific fats showing that there is a genuine issue for trial.

Moreover, in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), a defamation case which specifically addresses the impact of the constitutional rule that actual malice must be proven by clear and convincing evidence on summary judgment standards, the Supreme Court stated:

> When determining if a genuine issue as to actual malice exists in a libel suit brought by a public figure, a trial judge

must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times.* For example, there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence. *Id.* [477 U.S. at 273, 106 S.Ct.] at 2523.

For all of the above and foregoing reasons, applying the standards detailed above, and considering the submissions of the parties, the Court is of the opinion that the plaintiff's claims against the defendant Advance are entirely without merit and that summary judgment is warranted. Accordingly,

IT IS ORDERED that the defendant's Motion for Summary Judgment is hereby GRANTED.

The Clerk of Court is hereby directed to enter judgment in favor of the defendant, Advance Magazine Publishers Inc. d/b/a Conde Nast Publications and against the plaintiff, Perry Russo, dismissing his claims against the defendant, plaintiff to bear the costs of these proceedings.

---

**39.** The instant case is set for bench trial on December 14, 1992.